Thank you, Judge Fischer, and may it please the court. My name is Miguel Estrada. I am counsel for Professor Yoo, and with the court's permission, I would like to reserve five minutes for rebuttal. You may. You might pull the mic a little closer to it, too. The judgment of the district court must be reversed because each of the key reasons the district court gave for recognizing a Bivens action and for denying qualified immunity is contrary to binding case law in this circuit and the Supreme Court. Let me start with the Bivens remedy. The district court misconstrued both prongs of that doctrine. The court rejected habeas corpus as an adequate alternative remedy on the primary, indeed sole, stated ground that a habeas corpus petition, regardless of its scope, would lie against the custodian of the brig and would not afford a monetary damage as against Professor Yoo or anyone else who may have come up with the system of detention. That type of reasoning on the adequacy of the alternative is flatly contrary to the law of the circuit as stated in Western Radio. As you may recall, in Western Radio, this court held that the APA, the Administrative Procedure Act, is an adequate alternative mechanism, even though obviously it provides only for judicial review of agency action and does not furnish an action in remedies against any individual officer. What would Mr. Padilla have been able to do in the course of his proceedings, and what is he able to do since he was transferred away first from the civilian court, then into the military court, then back in what appears to be somewhat of a strategic move by the government to take him out of the military custody and put him back into civilian proceedings? Where would habeas have been available to him in the course of that, and where would he be once he was out of the brig? As the Supreme Court ultimately determined in his own case, habeas would have been available in the district of his actual physical incarceration. As you may recall, Professor Yoo had long left government service by the time he was transferred back and forth. But I'll make two points that are relevant to the habeas remedy, lest they get lost. You know, the first one is that under the authoritative construction of the federal statutes that the Supreme Court gave us in a case called Carafas v. Lavallee, which is at 391 U.S., the custody, if it obtained at the beginning of the filing, is sufficient to continue the court's jurisdiction under the habeas statute, subject only to a determination by the court that the action has become constitutionally moot, as in Lane v. Williams. Obviously, as I think everybody knows, a voluntary cessation by an adversary is not usually sufficient to render a case constitutionally moot. So if Mr. Padilla had sought habeas after he'd been transferred from the brig, he would have been able to challenge the conditions of the brig, the confinement and the conditions of confinement? He would have been able to challenge the conditions of confinement insofar as his challenge depends on the proposition that he was inappropriately treated because he was not, in fact, an unlawful combatant. And as we read paragraph 4 of the complaint, his challenge to the conditions of confinement do hinge on the determination of his unlawful combatant statutes. Obviously, we're talking here solely about prong one of the Bivens inquiry. You're saying there are alternative remedies. I'm trying to understand. He was transferred from the brig. The Supreme Court, as I recall, that mooted the case. No, that is not right, Judge Fischer. There was a petition that went up from the Fourth Circuit case. After the Fourth Circuit had ruled that on the stipulated facts he was properly deemed an enemy combatant, but that he could, on remand to the District Court of South Carolina, develop a full factual record as to whether, indeed, he was an enemy combatant. It was at that point that the government moved to transfer him to civilian custody. At that point, could he have continued his challenge to the conditions he had imposed upon him while he was in the brig? To the enemy combatant designation, he would have continued. That's not my question. No. The conditions under which he was held. Yeah. I think I'm agreeing with you, Judge Fischer. He would not have a challenge under the habeas statute to the conditions of confinement standing by themselves, apart from the fact that in this case, as pleaded, they hinge on his contention that they were unlawful because he was more akin to a criminal defendant than to an enemy combatant. But, of course, we've been discussing merely step one of the Bivens inquiry, and even in cases in which clearly it is true that there is a complete absence of an adequate alternative remedy, there is a second important prong of the Bivens remedy, which is the old – which is the factors that counsel hesitation. And in that – Before you get into that, let me just see if I can understand your theory. If Mr. Padilla had been held as a pretrial detainee – take away the enemy combatant status – if he had been held as either a material witness or a pretrial detainee for some reason in a federal prison, and he had been subjected to sleep deprivation, denied medical assistance, denied the Koran, would he have had a cause of – a Bivens cause of action against prison officials for violation of his constitutional rights? He might have. All right. So he might have. All right. He might have. I think I would need to know more facts, and certainly more than he actually pleads in the complaint. I'm just trying to get an understanding. But because – so if he had – let's say it was stipulated on both sides that he had been kept awake for 72 hours in bright lights, lots of noise, for purposes of interrogation, break him down so that he might divulge information, and he developed a serious medical problem and there was no medical relief, and he wanted to be able to honor his religion and pray and read from the Koran during that 72-hour period. Let's assume those facts, and he was a pretrial detainee. Would he have had a Bivens action against the prison officials who inflicted that upon him? He might have had a – I mean, again, depending on the more detail of the facts, but at least in theory, he might have had a Bivens action against the line officials under the Carlson case. All right. Now, okay, so let's – because I don't want to use up all your time on the hypothetical, but I'd like to then say, how far up the chain of command is your theory – does your theory allow that kind of action to proceed? In other words, can it go up to the warden if he was part of the process that inflicted it? If he was – I wouldn't say something as imprecise with your forgiveness as being part of the process. I believe what the Supreme Court expressly required in the Iqbal case is personal participation. But let me hasten – If there was personal participation by the warden, then he could state a cause of action. If he got past Iqbal. If he got past Iqbal and he pleaded adequately, he might, but the issue that I would like to highlight in the context of a hypothetical, Judge Fischer, is that you're positing a cause of action that has been essentially already recognized by the Supreme Court in the Carlson case in the context of – That's my point. I'm trying to understand where you are departing from it, is if it can go up to the official at the highest official at the prison, are you suggesting that you could not then continue up the Federal chain of command up through the Department of Justice? If you haven't seen the biggest cause of action, which is one of the questions at issue here, because we are not dealing with a situation in which one has already been recognized by the Supreme Court in this context. Well, it has been recognized in the context of prison conditions, and that's what I'm trying to understand what you seem to be arguing as a matter of law. There cannot be a Bivens action against the senior policymakers in the Department of Justice, of which the Bureau of Prisons is a part. So the question I'm trying to understand in your argument is, are you saying that we would have to create Bivens action in order to apply the Carlson kind of relief all the way up the chain of command, so long as the plaintiff could prove, allege and prove, that it went all the way up as high in the Justice Department as he could prove that they were directly involved? I'm not saying any of that, Judge Fischer. And the issue that I've been trying to get at, and with all due respect I have not been able to, is that all these questions bear only on the question of qualified immunity. They don't really bear on whether there is an extent antecedent cause of action. Because as the Supreme Court looks at these questions, it has had three parts of the Constitution in very specific factual contexts, a certain seizure in an ordinary law enforcement context in Bivens, Davis v. Passman, and Carlson. Since then, they have relentlessly made very clear that any new context that involves the assertion of rights that were not recognized in the context identified in those cases really has to be assessed by reference to the two-step test of Wilkie, which has to do first with the adequacy, which we discussed, and second with the special factors of counsel hesitation. Now, I have said not a word yet about special factors. I just want to make clear that your theory of inquiry seems to assume the existence of a cause of action in what we have been essentially been discussing, the question of qualified immunity. And since you started with the premise that this might or might not be unlawful if Mr. Padilla had been a civilly committed detainee, that is, in fact, one of the key errors of the district court in this case, because one cannot simply conclude that the category of enemy combatants has come out of thin air in the last two years since this litigation started. And one cannot simply assert, as though it were self-evident, that the rights that would be accorded in the civil prison context have to be transferred to enemy combatants. Now, the most obvious example of that is that at the time the memos were written, the bulk of which, by the way, dealt with conduct against aliens in foreign countries and not against things that might happen in this country. But at the time the memo was written, the extent leading authority on enemy combatants was a unanimous Supreme Court opinion in Ex Parte Querid, where the Supreme Court indisputably, countenance, treating enemy combatants quite differently from civilian prisoners, in that the court conceded that the Fifth and Sixth Amendment rights had not been accorded to the inmates in that case, and basically signed off on what was basically a summary execution of these people. And so with the background of Ex Parte Querid, one could not reasonably conclude that the correct starting point for the inquiry would be whether this is comparable or whether the rights have been established in a quite distinct context of civil detainees, because as the Fourth Circuit also... You're talking qualified immunity. Right. And I am only talking qualified immunity because the thrust of your questioning really does deal with qualified immunity. Well, no, I was addressing the issue that was much mooted in the Second Circuit case about whether we're in a different context. But in any event, I've read your brief quite thoroughly. I understand what the theories are. I wasn't sure about my question was trying to drive at what I found to be ambiguous in your briefs as to whether there, in your view, there is a blanket prohibition against applying Bivens to senior policy-level people like the Attorney General, the Deputy Attorney General, the head of OLC, or whether if you could properly plead it, it would fall within the parameters of a case like Carlson. So we're really not dealing with a new context. We're simply dealing with an extension of the principles of Carlson. That was my purpose of my question. I mean, I do think that I want to make clear that my answer has to do with whether the pleading adequately alleges the personal participation of the official. That's an equal question. Now, let me say that I understand that there's a wrinkle in the circuit having to do with the Elkid case, where this Court has effectively held that the Attorney General, as a policymaker, may be held liable under Bivens, though the issue was not actually litigated in that case, possibly because it was really a Bivens case. It's a Fourth Amendment case. And so the sole issue was a qualified immunity question. I think we can, you know, let the Supreme Court sort out, you know, whether that's right or wrong. I don't think it's relevant here because what's dispositive here is that all of the allegations as to policymaking of this defendant are both conclusory and implausible. Excuse me. You don't simply sort of assume that a mid-level lawyer in the Justice Department will be running, you know, the policy. No, wait a minute. Wait a minute. Mr. Liu has written a book where he described himself as being much more than a mid-level lawyer in the Justice Department. He was part of a very small group, the War Council, and he went beyond his role as Deputy Assistant Head of OLC. So we shouldn't oversell or undersell Mr. Liu's role in this. I disagree with that, Your Honor, because that is indeed a conclusory allegation, and it necessarily incorporates the book cited. And if you look at it, you will not find any evidence or anything that would support an allegation that anything happened other than his passing on the question of lawfulness. Now, let me say just a quick word about the special factors on whether there can even be a cause of action in this case. And in this aspect, I think I will just simply say that the one item of reasoning that was proffered by the district court, which is, you know, the absence of a pecuniary remedy as the beginning and end of the special factors inquiry, is really contrary to Stanley. And what really ought to have been the focus of the Court were the questions of separation of powers that were so fully and well explored in the Arar case, which, by the way, was denied this morning, and also the deep and obvious workability problems, as in Wilkie, when you allow a lawsuit against a lawyer who advises policymakers on questions of national security, because if anyone cannot see that that's an invitation to politically motivated suits with no judicially ascertainable standards, then I think all of the special factors that the Supreme Court has required the courts to consider have essentially become a dead letter. And with the Court's permission, I would like to save the remainder of my time. Sure. Judge Reimer, did you have any questions you wanted to interpose? It's a little late now. No, it is not. We have some time. You want to get them before rebuttal? No, that's okay. Thank you. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Jonathan Fryman, representing the L.A. You want to speak up and put the mic a little closer? Yes, Your Honor. I'd like to take off from where you just left things with opposing counsel and the question of Carlson v. Green. Carlson, of course, was a claim regarding alleged mistreatment of a prisoner, a Federal prisoner, and the claim was against a high-level Department of Justice official, in that instance the Director of the Bureau of Prisons. The Court accepted that claim, and it's well established as part of our law. In fact, the claims that we have here are very classic claims of the mistreatment of a Federal prisoner in Federal custody by Federal officials going beyond their proper roles. The only question before this Court is whether John Yu is liable to remedy these constitutional violations. And, Your Honors, we believe he is for three reasons. First, it was clearly established that this sort of brutal mistreatment violates the Constitution. We're talking about shackling in painful stress positions, sensory deprivation, sleep deprivation. There are a series of Supreme Court cases and Ninth Circuit cases holding these sorts of things individually to violate the Constitution put together during an incommunicado detention for nearly two years. They certainly violate the Constitution. The counsel for Mr. Yu argues, however, there's no precedent, clearly established precedent, as to the status of someone who is designated as an enemy combatant. The rules appear to be somewhat different for an enemy combatant, unless one is attacking the fact of enemy combatant status as a matter of law, that you can't have it. And I think you can't do that. So how do you argue, then, that it's clearly established that all of the pretrial detainee, for example, rights that apply, that have been applied, apply to Mr. Padilla? Because it's clear, Your Honor, that there is a floor of constitutional treatment for anyone detained. And no new category, no new description of a detainee can change that minimum level of treatment that the government has to give its citizens. And we know that in the 235 years of American history, we don't have a case in which an enemy combatant was tortured and brought a claim, in part because, Your Honor, we didn't have enemy combatants tortured before. There was no torture in that case. There are no claims of mistreatment in that case. There was execution following a trial by military commission in that case, Your Honor. And what we know from this Court's decision in Heydrich v. Hunter is that the mere existence of some category that the case law, the floor hasn't been previously applied to. In Heydrich, it was sexually violent predators. Merely coming up with a new legal category is not enough to make the floor go away. The floor doesn't drop out and allow the government to do whatever it wants, or individuals exceeding their legal authority to do whatever they want to people detained by the United States. There is a floor. Heydrich sets it, and the Hope v. Pelcher case in the Supreme Court says the fact that we haven't seen a case on all fours with this before doesn't mean that the standard isn't there. These are the most fundamental guarantees to bodily integrity that our Constitution offers, that we as a people offered to ourselves in enacting the Constitution. That's the first of the three reasons, Your Honor. The second is the need for remedy and deterrence. And Congress's recognition of those needs in this context outweigh any opposing concerns, and that's under the Bivens analysis. And the third reason ---- The most specific instantiation of Congress's recognition, Your Honor, was in the Detaining Treatment Act. And I would point your attention to the specific language of the statute, because I think it's striking how specifically Congress has thought about this context and decided not to take away the backdrop assumption of Bivens claims. I'm pointing now to Section 7E2 of the Military Commissions Act, which states that And Congress said this. No court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination. Congress made a clear choice here, Your Honor, to strip the courts of jurisdiction to preclude Bivens claims or other sorts of claims by noncitizens. It also, and equally clearly, chose not to extend that prohibition to citizens. And Congress, of course, was acting against the backdrop of Bivens. I would point Your Honor's attention to a couple of places in which Congress and the The first is, following the initial descriptions about special factors counseling hesitation and their strongest statements in the cases of Stanley and Schweiker v. Shalicki, Congress passed the Westfall Act in 1988. And the Westfall Act clearly preserves constitutional claims against Federal officials in their individual capacity. And that's a recognition right after special factors are spoken of in their strongest form that Congress means it to continue, means Bivens remedies to continue. That's discussed here. To go your direction would require us effectively to split with the Second Circuit and its special factors analysis having to do with extraordinary rendition. Why should we do that? Well, first of all, Judge Rahmer, I don't think it would require you to split with the Second Circuit. The Second Circuit, the majority on bank opinion in Arar, says that the case, and I'm using the majority's words, is emphatically about the context of extraordinary rendition. There are several statements in the opinion saying that over and over again. Footnote 14. I understand that. I understand that that's a different, arguably objectionable thing which was done. But the analysis of the special factors and the Court's conclusion with respect to them strikes me as being quite applicable here as well. Well, Your Honor, I would be happy to march through all of the particular supports on which the Second Circuit majority based its decision. But really the strongest and the reason that this Court need not in any way split from the Second Circuit is the fact that in the context of extraordinary rendition, what the Second Circuit was concerned about was the effect on foreign affairs. And, in fact, the majority said quite explicitly this would require ---- Well, let's just be a little specific. First of all, the Second Circuit was concerned about the workability of going there. Here we would be marching into very murky, untested, certainly murky context.  of the Second Circuit in this area of constitutional law and drawing lines which haven't up until now been clearly drawn. Why isn't it just simply an unworkable standard for imposing personal liability and damages on a non-policymaking lawyer in the Department of Justice? Well, Your Honor, the first thing I would say is I don't think that this is a new kind of cause of action. I think that this falls under Carlson's ---- I didn't say it was. I said it was murky and arguably untested. Well, the Supreme Court has explicitly considered claims against lawyers and claims against federal officials acting in their national security capacity. In the cases of Burns v. Reed and Mitchell, let me just talk about those for a moment. And I recognize those are immunity cases. I do want to come back and explain why they're relevant in the special factors analysis. But in the case of Burns v. Reed, we have attorneys who gave advice on interrogation techniques to police officers. And there was a 1983 claim brought up against them. And the Supreme Court said, we are not concerned with overchilling lawyers in this context because, in fact, we need to chill lawyers up to a certain point. That's the point of qualified immunity. What qualified immunity says is all but the plainly incompetent ---- But you're not going to get there. You're not going to get to qualified immunity unless you get past the Bivens hurdle. You ain't got a cause of action unless you get past that hurdle. Yes, Your Honor. And in the Bivens ---- You've got a shot if you'd like to take it. My specific question is why the Second Circuit's analysis is not equally persuasive here. In essence, Your Honor, if one gets to the second step of Wilkie under the Bivens analysis, then this is a common law court weighing the pros and cons as to whether to create a cause of action. If that's where we are, and I take that ---- But in simple words, in 25 English, in 25 words or less, why should we imply a cause of action here in light of the Second Circuit's special factors analysis? Because in the most simple words I can think of, it's a 5-2 game, Your Honor. There are five factors on our side and two factors on their side. On our side, there is Congress's clear recognition here. There is the need for deterrence, which is expressly recognized by the Supreme Court. As a matter of fact, in cases refusing to extend Bivens, in Malesko, for instance, the Supreme Court refuses to extend Bivens to the context of private companies because it won't provide enough deterrence. They want the individuals to be deterred, and it won't do it if private companies are subject to Bivens liability because they'll be sued instead. So there's the need for deterrence. There's the need for remedy, which has been recognized since Bivens and throughout the case law. There is the notion of parity, Your Honor, parity between State and Federal officials. We know under Burns that lawyers can be liable for the advice they give. Are we going to treat Federal lawyers different than State lawyers? Are we going to treat Section 1983 different than Bivens? And finally, and I think most importantly, there's the question of fairness, Your Honor. There's no question but that the line-level people who did what they did here are liable. The question is now, are we going to take people who are higher up the chain and say they're not liable, even though they're the ones who gave the green light, even though they're the ones who gave the order? And Your Honor ---- Well, actually, that's an interesting question because there is nothing that I've seen that indicates you claim that you directed anybody who was inferior to him to do something which turns out to be unconstitutional. Rather, it goes backwards. So for sort of like the first time, at least that I'm aware of, you've got an upwards direction and a backwards one. He gives advice to the President who then makes a decision that's implemented by a bunch of other folks, or the Secretary of Defense or one of his designees makes a decision that's implemented by other folks. So now you're imposing liability on a lawyer for advice that's given to someone who is superior to him, who has the decision-making authority. Yes? Well, Your Honor, the claim here ---- I mean, this is a causation question, ultimately. He has himself stated that he was a part of the War Council, as Judge Fisher pointed out earlier. I have no idea what that means, absolutely none, nor do you ---- you allege it. There's no allegation that the War Council in some way had delegated powers from the President of the United States. There is an allegation that he was involved in policymaking as part of his role in the War Council, and that allegation comes from his own admission, Your Honor. It is the opposite of a naked assertion. It is something that comes from the admission of the very defendant in this case. So we have his own admission that he engaged in policymaking. And, Your Honor, if the question ultimately ---- I take it your question goes to the plausibility of our allegations of causation under Iqbal and of whether we can really say that either that he willfully twisted the law in order to give the green light to torture or that, in fact, he did something that led very particularly to Mr. Padilla's abuse. And I'm happy to address both of those very directly. With respect to causation, do you make any distinction between the fact of detention of Mr. Padilla as an enemy combatant on the one hand and the conditions of his confinement on the other? In terms of causation, Your Honor? Yes. Well, I mean, our position is that we have plausibly alleged his responsibility, his personal participation in the language of Bivens, his causation of both of those. In both? Yes, Your Honor. And let me just go to the conditions of confinement first. Before you go to that, can I just ---- before we leave the Second Circuit opinion, the majority could have avoided doing anything on Bivens by simply remanding to the district court to examine under Reynolds the state secrets aspect of the case. And they implied in their opinion that that could have been readily disposed of. I don't know whether they were presuming that the case would have been lost on that basis. Why isn't the state secrets aspect of this case, if you were going to take it into the War Council, equally preclusive or likely preclusive, at least under the special factors analysis? Your Honor, I think there was one distinction between that case and this, which was that there the government had intervened and asserted the state secrets privilege in the case. Well, the government filed an amicus brief in this case. Yes, but they have not intervened in order to assert the state secrets privilege. But one thing that I would point out, Your Honor, is that, in fact, insofar as there are any concerns about national security issues that go beyond what the Supreme Court has already identified in Mitchell v. Forsyth, those concerns are appropriately addressed through the doctrine of the state secrets privilege as well as through the Classified Information Procedures Act. And in the event that there are any concerns there, they can adequately be handled by that. So if the government, in fact, thinks ---- I mean, there's obviously an enormous amount that's the public record right now. But if the government, the United States government, believes that state secrets should in some way be involved, then the government can and should intervene, can and should raise the state secrets doctrine, and then the Court can and should adjudicate that issue. But that's not something that the government has yet done. The ---- I think it's important also to recognize that the Supreme Court has recognized itself. When a particular concern has been dealt with in another doctrine, then it should not be something that's considered in the special factors analysis. And I would point your attention to the case involving the action against the Congressman, in which there was a concern about that the Congressman had, in fact, discriminated against someone who was working for him, and there was concern that this would chill congressional speech in some way. And the Court said, well, you know, we have the speech and debate clause. We have another doctrine that takes care of those concerns. We know that he can assert that. We know that that can be taken care of. So we shouldn't double count it and factor it in here in the Bivens special factors analysis. In the same way, the State Secrets Privilege, Classified Information Procedures Act, already account for those concerns and shouldn't be double counted in the special factors context. You can come back to your causation argument. Yes, Your Honor. And I think the question was, under Iqbal, is it plausible, have we plausibly alleged, in fact, that he intentionally acted in a way to cause the brutal mistreatment of Mr. Padilla? Well, I have that question. I also have a question more generally, whether there's a basis to imply a Bivens action with respect to one of those issues but not the other. Well, Your Honor, I don't mean to sound like a broken record, but as to the conditions claims, those have been recognized under Carlson. This is not a new context at all. So I don't think there's any need to imply a cause of action when one has been acknowledged in the very context of Federal inmates who have been allegedly mistreated. But as to the causation issue, I mean, we do think that a fair inference from the totality of the complaints is that John Yoo was involved in every detail of the detention and interrogation. And there are a few things that, taken together, I think show the plausibility of the allegation that he personally participated in my client's abuse. And I would point these things to your attention. First of all, we have alleged and we know that he wrote memos as to Mr. Padilla individually, memos just dealing with Mr. Padilla. He wrote the memo regarding his detention. We have alleged that he wrote a memo regarding access to legal mail at the brig. This is the level of detail that we're talking about. Would he be permitted to receive legal mail? We know that there are e-mails among brig personnel waiting on the memo to figure out whether they can send mail. The notion that there would be a memo regarding access to legal mail and not a memo regarding interrogations, that's what's implausible. He was overseeing, he was, as we've alleged, the de facto head of the War on Terror issues in the OLC. And, in fact, he wrote memos saying the Fourth and Fifth Amendments were not applicable to United States citizens in the United States during military operations. He then writes a memo saying that Padilla's seizure and detention is a military operation. And then he says that the Fifth Amendment doesn't restrict the war-making power and that the war-making power includes interrogations. He says the Fifth and Fourth Amendments are gone as to U.S. citizens and he's written specifically as to Padilla and we have only two citizen enemy combatants held in the United States. We think, taken as a whole, this more than meets Iqbal. It's certainly far beyond what was alleged in Iqbal itself. Your Honor, I would like to point your attention briefly to one other Iqbal issue, which is the question of what we have in terms of the notion that he willfully twisted the law. This doesn't go to Mr. Padilla personally. This goes to the question of how deliberate was this. Was this just negligence, which was enough under Burns v. Reed, or is this more, as we've alleged here? We've alleged either willful blindness or willful twisting. And first of all, of course, the standard is have we just made naked assertions devoid of factual support, or have we said something that's plausible? And here I would point Your Honor's attention to two governmental reports which have come out of which this Court can take judicial notice. One was presented to the district court below. The OPR report, the Office of Professional Responsibility of the Department of Justice, found that Hughes' actions were intentional. That's a quote, in order to accommodate the client. The Senate Armed Forces Committee report, which we brought to the attention of Judge White below, the Senate Armed Forces Committee report found that the law had been distorted in order to rationalize abuse. Your Honors can not only take judicial notice of these reports, but these are more than enough to show that our allegations as to intentionality or willful blindness are plausible. These are executive and legislative statements showing that they have found it to be plausible. In fact, the report by Mr. Margolis of the Department of Justice, who wrote his own report opining on the OPR report, he said it was a close question as to whether Mr. Hughes had acted intentionally. Close question is his quote. That's more than plausible, Your Honor. The need under Iqbal is not to prove our case when we file the complaint. It's just to nudge it beyond the level to plausible. Your Honor, I'd also like to point something out, which is the next couple of minutes. Yes, Your Honor. What Mr. Hughes is asking for is a rule of law under lawyers, under which lawyers would never be liable for what Mr. Hughes is  as to what process a detainee in that position could claim in habeas corpus. And you can look no further than the Hamdi opinion, which of course is later than what we have, to recognize how obvious it was that even the plurality in the Supreme Court said that of course habeas is available, there is a role for the courts, we're going to do a Matthews versus Eldridge balancing to figure out how we can accommodate, you know, this in the detainee of an enemy combatant context. To be sure, one could say that calling a context a Tuesday case doesn't make it a legally significant context, but Anderson v. Creighton requires the court to look at the most legally relevant context, and one has to be a legally relevant context undoubtedly if the Supreme Court itself has recognized it as a distinct category of cases. Obviously, if all of what he says is true, he did file a habeas corpus petition two days after he was put in military custody, and if everything that he says were so obvious, Judge Mukasey would have freed him immediately. Of course, we know that did not happen. Now, on the question of the World Council, this is a question of deep plausibility. Having had our country been attacked in a massive loss of life, it would be shocking and surprising if the highest echelons of our government were not meeting and pondering how to meet the terrorist threat. This is much akin to what the Court said in Iqbal itself. Well, of course, there was a disproportionate impact on this particular class. That's what we were fighting. And finally, on the question of the OPR report, the OPR report is not a government record, and in fact, as we all know, because we know it from justice, it is subject to review and revision by Mr. Margolis, and he declined to issue it to the bar because he found it riddled with errors. And to say that this is a government report that you may consider in your opinion is about as plausible as saying that a memo from your law clerk is an in-circuit opinion. One last point on the special factors. We cannot get away from the fact that the Supreme Court, whether we like it or not, for 30 years has steadfastly refused to recognize new contexts of forbiddance. Now, Mr. Friedman would like to argue, you know, the grandiloquent rhetoric about what might be done if people are engaged in actual abuse. Nothing that he says shows that Mr. Yu was doing anything having to do with his client that is objectionable. The memos that he described are in the second volume of the E.R. and, you know, one having to do with the application of the Detention Act was actually, you know, the conclusion that it was not applicable was of help and handy. And the second memo, which simply said that based on the facts provided by the intelligence agencies and the criminal division, this person could qualify as an enemy combatant, is actually true based on what the Fourth Circuit said. How you could then say that you are going to allow that sort of lawsuit against a government lawyer and not open the floodgates to politically motivated lawsuits that invade the separation of powers and probe government secrets and really try to examine all of the background information of the intelligence community to figure out whether this was really true is actually impossible to contemplate. Final point on whether the state secrets doctrine or any other cautionary measures on remand might be sufficient to cap in the genie and put him back in the bottle, the same argument was made to the Iqbal Court. You know, the notion that you could rely on the district court to have an adequately respectful scope of discovery, and the court ultimately said that that simply ignores the role of immunity in our system because it is a law. Yes, but that gets then to qualified immunity. The issue that troubles, I think, the courts is being pulled into a very difficult area with strong arguments on both sides. There is a fundamental notion of accountability. Even, I mean, Iqbal makes the point of saying whatever person's title is, the issue is what was the conduct that was engaged in. And that is what Iqbal was focused on, and it clearly set a high bar before it was going to have the courts get involved in it. But as Hamdi said, the government doesn't have a blank check, and that's what we're wrestling with. Yeah. I think there's a difficult case where there are difficult choices, and that's unfortunately what one has to wrestle with in a case like this. And fully understanding that, Judge Fischer, I will point out again that Hamdi was, in fact, the heaviest case, and that all of the arguments — That's fine, counsel, but you're missing the point. Let me try to restate my point in a different way. All of the arguments that the defendant, you, made, which are ostensibly so legally flawed that, you know, they by themselves allow the conclusion of intentional misconduct as a matter of pleading, were placed in front of the federal courts in front of impartial decision-makers. They, like you, found these questions close and complicated. But the same arguments were made by the Solicitor General on behalf of the government and by attorneys in the Southern District of New York. And if having had those arguments considered by an Article III judge and having those have been found close, not so close, and flip-flopping back and forth all the way to the Supreme Court is not itself a demonstration that this is a case that is merely about a policy disagreement of the type that should be settled at the ballot box, I don't know what is. Thank you, Your Honor. All right. Thank you, counsel, for the argument. We appreciate the argument on both sides. And the case, arguably, will be submitted. We're going to take a short recess while we move some of these materials off the bench, and we'll be back in about five minutes.
judges: Pallmeyer, Rymer, Fisher